THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN WARREN EVELAND, Defendant-Appellant.

Fourth District    No. 4—88—0427

Opinion filed March 23, 1989.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Brett Irving, State's Attorney, of Pittsfield (Kenneth R. Boyle, Robert J. Biderman, and Michael K. Blazicek, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On March 31, 1988, defendant John Warren Eveland was convicted by a jury in the circuit court of Pike County of the offense of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) as the result of the death of his daughter, H.E. On June 10, 1988, defendant was sentenced to a 45-year term of imprisonment. Defendant appeals.

Defendant's sole argument is that the trial court committed reversible error by not granting a mistrial when evidence of prior unrelated criminal conduct allegedly perpetrated by the defendant against his family was testified to by one of the State's witnesses.

### FACTS

The undisputed evidence clearly establishes H.E., a 2-year-old, 33-

inch tall, 24-pound girl, died on December 14, 1987, as a result of a beating which occurred that morning. She had been beaten with a belt, a wire hanger, and a toy guitar, none of which blows caused the fatal injury. She had suffered a nonfatal head injury. Death was the result of, probably, a single severe blow by a blunt object to the abdomen which tore apart her liver and fractured one left rib and one right rib. The death-causing injuries could not have been caused by a spanking.

The events of the morning leading up to the fatal injury to H.E. were basically related by two witnesses, her mother, Melinda Eveland, and her father, the defendant.

According to Melinda Eveland, on December 14, 1987, Melinda and defendant were living together in Pittsfield, Illinois, with their two children, T.E., a son three years old, and H.E., a daughter recently two years old. Melinda and defendant arose around 9 a.m., at which time both children were in the living room, in their pajamas, watching television. It was snowing, and defendant told Melinda to go to Wal-Mart and obtain a cover for their boat, which was parked in the backyard of the residence property. Melinda was hurried by defendant to make the trip to Wal-Mart and did not completely dress for the day. She went directly to Wal-Mart, purchased the tarp, and returned home, entering the kitchen door. According to Melinda, defendant came running at her in anger and said: "If you ever leave me with a mess like this, I swear I'll kill you." Melinda ended up on the floor by falling, being shoved, or pulled down.

Melinda got up from the floor and went into the living room, and found H.E. nude, partially on the floor and partially on a cushion, lying on her stomach. She pulled H.E. up, noticed a large bruise over an eye, and took her to her bed in the children's room, covering her with a blanket. T.E. was in the room picking up his toys and appeared scared. H.E.'s eyes were opened, and she said, "Mommy, Mommy," to Melinda. Defendant came into the room and said H.E. had to get up and pick up her toys, just like T.E. Melinda tried to get H.E. to stand, but H.E.'s legs were limp.

Defendant directed Melinda to pick up the mess in the bathroom, and she left the children's bedroom with H.E. lying on the bedroom floor. Melinda stated she heard defendant say, "I hate this little bitch," and saw him raise his bare foot "[m]aybe knee high." He was standing over H.E., and Melinda heard a thud that was not consistent with the sound of a foot hitting the floor. Defendant was very angry, and Melinda, without defendant's awareness, obtained her coat and decided to leave the residence. She heard bath water running, and

heard defendant say, "You're going to take one too." As she was leaving, she heard a splash and a thud.

Melinda left the house, driving her automobile to defendant's mother's home, could not find her mother-in-law, but later met her mother-in-law while driving on one of the streets in Pittsfield. After talking to her mother-in-law, both women eventually proceeded to the police station where Melinda talked to Officer Floyd Moss, who soon left for the Eveland home. A few minutes later, the police dispatcher told Melinda to go to the hospital. After arriving at the hospital, she was told H.E. was dead.

Melinda had bathed H.E. on the evening of December 13, and the only bruise she was aware of was one on H.E.'s temple, which was different from the one she saw over H.E.'s eye that morning. At the hospital, defendant told Melinda H.E. had fallen in the bathtub.

Melinda is five feet tall and weighs 98 pounds.

Defendant testified he arose on December 14, 1987, saw snow coming down, and stated that he "asked" Melinda to go and get a tarp for the boat. "There was an argument"—"just verbal." While Melinda was gone, he "swatted" H.E. a couple of times for taking things off the Christmas tree. He then started to dress, found H.E. again taking "stuff" off the tree, "swatted her on the bottom a couple times," picked her up, took her to the bathroom, and noticed her dirty diaper. He removed the diaper, put it in the sink, started to run bath water, told H.E. to stay there, and went for T.E. Upon returning, he "noticed that [H.E.] had thrown her dirty diaper into the bathtub." He wrung out the diaper in the stool, and took it to the kitchen trash can. Melinda walked in, having returned with the tarp. Defendant denies any confrontation when Melinda came into the house and denies Melinda fell to the floor. He did ask her to talk with H.E. He stated, "I was just a little upset." Defendant testified he saw Melinda go pick up H.E., and "raise her arm," assuming for disciplinary purposes. He went to the bathroom to clean the tub, taking "approximately maybe ten minutes or so." Defendant came into the bedroom. "[Melinda] seemed to be upset and seemed to be out of breath," and had covered H.E. in her bed. Defendant testified he "told [Melinda] that she couldn't put [H.E.] to bed like that because [he] knew that she was still dirty." He uncovered H.E, picked her up, carried her to the bathroom, and sat her in the tub. He noticed nothing unusual about H.E. except she was "very quiet."

Defendant left the bathroom, found Melinda had left, and the car was gone. He went to get T.E. and "heard a bang on the bathtub as if something had fallen or hit on the side of the tub." He found H.E.

sitting in the tub in a "daze[d] or woozy" condition. He noticed "a mark over her left eye." He picked her up, dried her and, being concerned, attempted to call his mother and others for assistance. Eventually, defendant took H.E. out to his jeep so he could take her to the hospital. Officer Moss arrived at this time and took defendant, who was crying and emotional, together with T.E. and H.E., the short distance to the hospital.

The evidence indicates, for all practical purposes, H.E. was near death or dead upon arrival at the hospital.

### ALLEGED ERROR

On cross-examination of Melinda Eveland, an attempt was made to impeach her testimony relating to defendant's stomping on H.E. by showing she did not mention that fact and the "I hate this little bitch" statement in initial statements to the authorities. Jill Sheppard, attending nurse in the emergency room at the time of H.E.'s admission, was called as a witness by the State, in part, for the purpose of relating Melinda's statement at the hospital on December 14, 1987, that "[defendant] was so mad at [H.E.] that he was beating her, he stomped on her, and threw her in a cold bathtub." In the course of obtaining this testimony, after objections to the leading nature of the State's questions by defense counsel, the following question by the State, answer by Nurse Sheppard, and motion by defense counsel took place:

"Q. [Prosecutor]: And what I would like for you to do now is limit yourself to any more detailed description of anything she claimed [defendant] might have done on the morning of December 14, 1987. Tell us what, if anything, of that variety she told you about.

A. [Nurse Sheppard]: She told me that he did this. She told me directly that he had beat her several times and that he had spanked the kids several times with a belt.

[DEFENSE COUNSEL]: Objection, Your Honor. Ask for mistrial."

Following the motion for mistrial, the trial judge excused the jury, heard arguments, indicated his concern with this statement of prior violence, and eventually recalled the jury into the courtroom, sustained the objection to the statement, and admonished the jury to disregard the last question and answer. He emphasized the answer was not proper, and asked the jurors to wipe it from their minds. He emphasized the jury's oath to follow the court's orders and instructions.

THE LAW

■■■ The general rule relating to the admissibility of evidence of other crimes is amply described in *People v. Wallace* (1983), 114 Ill. App. 3d 242, 248-49, 448 N.E.2d 910, 915, as follows:

> "Generally, evidence that the accused committed other crimes unrelated to the offense charged is inadmissible if presented merely to establish his propensity to commit crimes (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200), for such evidence may 'overpersuade the jurors and cause them to convict the defendant as an "evil person" worthy of punishment rather than because he is guilty of the crime charged' (*People v. Butler* (1978), 63 Ill. App. 3d 132, 139, 379 N.E.2d 703, 708)."

Erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal (*People v. Lindgren* (1980), 79 Ill. 2d 129, 140, 402 N.E.2d 238, 244):

> "In such cases, a conviction will be upheld only if the properly admitted evidence is so overwhelming that no fair minded jury could have voted for acquittal (see *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed 2d 262, 81 S. Ct. 290) or, to put it another way, only if the record affirmatively shows that the error was not prejudicial (*People v. Romero* (1977), 66 Ill. 2d 325; *People v. Stadtman* (1974), 59 Ill. 2d 229)." *Lindgren*, 79 Ill. 2d at 141, 402 N.E.2d at 244.

See also *People v. Carlson* (1982), 92 Ill. 2d 440, 449, 442 N.E.2d 504, 508.

Generally, a prompt objection to an improper answer which is sustained cures the error, but the proper inquiry is whether the defendant was deprived of a fair trial. (*People v. Cunningham* (1984), 130 Ill. App. 3d 254, 265, 473 N.E.2d 506, 515.) Evidence or statements of prior or subsequent misconduct can strongly tend to lessen the credibility of a defendant, and striking it from the record might not eradicate it from the minds of the jury. See *People v. McCray* (1978), 60 Ill. App. 3d 487, 490, 377 N.E.2d 46, 48; *People v. Scalisi* (1926), 324 Ill. 131, 144, 154 N.E. 715, 720.

■■■ In the present case, we find Nurse Sheppard's statement of prior violence does not warrant reversal because the record affirmatively shows the error was not prejudicial. (*Lindgren*, 79 Ill. 2d at 141, 402 N.E.2d at 244.) This is based on our conclusion that no fair-minded jury could have voted for acquittal regardless of the statement.

The evidence clearly shows H.E. died as a result of a severe blunt blow fracturing two ribs and tearing apart her liver. There is no evi-

dence that the mother inflicted such a blow. The whippings did not cause the injury. The head injuries did not cause the death. All of the mother's actions, running from the house, seeking help from her mother-in-law and, ultimately, from the police, strongly substantiate her testimony of the defendant's violent conduct. Such conduct is not consistent with a person who has not been threatened. The argument that a fall in the tub caused the injury is inconsistent with all of the medical testimony. The testimony concerning the blow by defendant's foot to the small child's abdomen is the only reasonable testimony consistent with the medical evidence. Melinda Eveland's testimony of what occurred is the only evidence consistent with the uncontroverted physical facts.

Affirmed.

KNECHT and GREEN, JJ., concur.