THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DALE DENNY, Defendant-Appellant.

Fourth District   No. 4—91—0872

Opinion filed February 25, 1993.—Rehearing denied March 24, 1993.

346

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

John Turner, State's Attorney, of Lincoln (Norbert J. Goetten, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In October 1990, a jury convicted defendant, Dale Denny, of one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(2)) and one count of home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a)). The trial court sentenced him *in absentia* to consecutive prison terms of 12 years for aggravated criminal sexual assault and 8 years for home invasion. Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred by admitting evidence of his prior bad

acts, (3) the trial court erred in allowing police officers to testify in detail about out-of-court statements made by the victim, and (4) the trial court erred by precluding him from presenting evidence regarding the circumstances behind the victim's prior conviction for disorderly conduct based on her making a false police report.

We agree with defendant's second argument and reverse and remand for a new trial.

## I. FACTS

At trial, the victim, B.H., and defendant presented rather different accounts of the events at issue. B.H. testified that she had dated defendant from 1981 to 1989, living with him for at least four of those years. In May 1989, while they were living in a house in Lincoln, Illinois—which would become the scene of the crime—they broke up and defendant moved away. B.H., then 29 years old, continued living there with her 11-year-old daughter, Jamie, and two other adults, Roger Skelton and Dawn Campbell (now Skelton). In September 1989, B.H. stopped dating defendant and started dating another man, David Horrom. However, B.H. continued to see defendant on an occasional basis after September 1989, having sexual relations with defendant "a couple of times," the last time occurring in late May 1990 at her house.

B.H. worked as a fry cook at Al's Main Event (hereafter Al's), a local bar in Lincoln. During the time she dated Horrom, B.H. saw defendant at Al's "almost everyday when I was working."

On Saturday, June 2, 1990, B.H. worked at Al's from 3 to 11 p.m. At about 10 p.m., she saw defendant drinking, spoke to him briefly, and resumed her work. After work, she went out to the bar, and defendant bought her a beer. Because defendant started talking in a loud, drunken voice, B.H. went to another room in the bar, but he followed her around the bar, eventually asking her where she would go after she left Al's. She told him she would either go to another bar, Madigan's, or home, but she did not specify which.

B.H. left with a friend and went to Madigan's around 11:30 p.m. Defendant showed up at Madigan's, got into an argument with B.H. and another patron about a pool game, and became belligerent. B.H.'s testimony becomes somewhat uncertain at this point. She testified that she then left Madigan's, but defendant followed her out, grabbed her, and pinned her against a building, holding her throat. She ripped his shirt as she struggled loose, reentered the bar, and went into the bathroom. After she came back out, she tried to avoid defendant, but he followed her to a table and again grabbed her and pinned her

against the wall. The tavern owner and bouncer separated them and told them to leave. They left separately.

When B.H. arrived at her house, she saw defendant standing on a nearby corner. He shouted at her to stop and talk to him, but she instead turned her car around and went to a friend's house. The friend had previously offered to put her up for the night, but she had not returned home by the time B.H. arrived at her house. B.H. nonetheless entered through a window and slept there for about an hour. Around 2:30 a.m., she awoke before her friend had returned and then drove home.

When she arrived, she searched her residence—her common practice. Although she testified that defendant never had a key to her house, including during the six years they lived together, she explained that she thought defendant might have entered through a window. However, she found nothing out of the ordinary.

As she prepared to go to bed, defendant suddenly emerged from a closet, brandishing one of B.H.'s large kitchen knives. B.H. screamed as he grabbed and kissed her, and they fell on the bed. He continued to kiss her violently, biting her lip. He then ordered her to stand up and undress, and told her that she "was going to fuck him." She took her clothes off and got back on the bed. As he held the knife in his hand, he proceeded to have sex with her.

After he finished, he got up, lit a cigarette, and inserted it into her vagina. He told her that "nobody else was going to have" her and that he "was going to kill" her. She told him she would have sex with him if he would stop acting as he did. She tried to pull the cigarette out, but it broke off inside her, and defendant stopped her from recovering the broken part. However, she did manage to remove the rest of the cigarette shortly thereafter. Defendant then sat on her chest and forced her to perform oral sex on him. After that, he again engaged in vaginal intercourse with her, this time ejaculating inside her. On cross-examination, however, she stated that he performed vaginal sex first, forced her to perform oral sex, then stuck the cigarette inside her, and then performed a second act of vaginal intercourse.

B.H. testified on direct examination that after defendant finished having sex with her the second time, he lay next to her and gently poked the knife point into her chest, telling her that nobody else could have her. He then gritted his teeth and repeatedly told her that he had to kill her so that nobody else would have her. However, he did not attempt to carry out this threat.

They lay there together until about 5:30 a.m., when B.H. fell asleep. About 7:30 a.m., B.H.'s boss at Al's came to her residence be-

cause she was late for work. B.H. then told her boss that she had had some trouble with defendant the previous night, but did not provide any particulars about defendant's conduct. Instead, B.H. got dressed for work as her boss waited. Defendant briefly awoke as she dressed, but they said nothing to each other, and he fell back asleep.

At work, B.H. told three people of the previous night's events in varying degrees of detail. She told her boss that defendant had jumped out of her closet with a knife, but did not tell him much else. She told two female employees that defendant had jumped out of the closet with a knife, that he probably wanted to kill her, and that he had burnt her vagina with a cigarette; but she said nothing about defendant's having sex with her or raping her. One of these employees encouraged her to phone the police, but B.H. did not.

After work, around 1:30 p.m., she returned home to find defendant working in her garage on a headboard for her waterbed. She approached him and said, "You don't treat a dog like you treated me." He responded that "nobody else was going to have" her.

That evening she went to her mother's house and told her what had happened the night before. They then both went to a hospital emergency room because B.H. felt discomfort in her vagina. Two registered nurses, Julia Wilham and Judy Worth, examined her, and B.H. told them that defendant had raped her at knife point and placed a lit cigarette into her vagina. Worth noted B.H.'s cut lip, the burn and bruises in her vaginal area, and the bruises on her chest, arms, and legs. She also observed three round vaginal burns about the size and shape of three dimes touching each other. She added that these areas appeared white and mucousy, consistent with how a burn would look. Doctor Raymon Climaco then examined B.H. as well.

Afterward, B.H. spoke to two police officers, Michael Gehrets and Sergeant Larry Hill, who had been called to the hospital. She told Gehrets about the previous evening's events, although she varied the sequence of events when she spoke to him.

The next day, June 4, a police officer phoned B.H. at work and asked her to bring the knife defendant had used to the police station. She went home to get the knife, but when she saw defendant's truck outside her house, she did not go inside, going instead to the police station. Gehrets and Officer John Coombs then accompanied her to her house. When they arrived, they found defendant unconscious on B.H.'s bed dressed only in his underwear. Several sleeping pills lay strewn around the bed, and defendant was clutching pictures of B.H. and Jamie.

The officers found a note addressed to B.H. next to the pill bottle on the nightstand. The note reads as follows:

"My Dearest [B.H.]

this is the last letter you will ever get from me[.] I want you to know that you are my only love[.] I talk to my mom [...] I love my childs [*sic*] and I hope they understand. [B.H.], I can't hold my head up[.] I just want you to no [*sic*] that I love you[.] Please Beleave [*sic*] me (I love you)[.]

Dale"

They called an ambulance, and the paramedics revived defendant at the hospital. B.H. also gave Gehrets the knife defendant had used to threaten her.

Coombs testified that he took a statement from defendant at the hospital. Defendant told him that he had stayed at B.H.'s house two or three nights per week in the weeks before the incident. He admitted that he and B.H. had argued at Madigan's, and that he drove to B.H.'s house to talk to her. However, he said that when he saw B.H. at the street corner, she let him in her car and drove to her house. When they arrived, they eventually engaged in consensual sex. Defendant volunteered that he lit a cigarette after they had sex and smoked it near the end. As he reached over her to put it in an ashtray on the bedstand, some ashes fell off onto her stomach. They both brushed them off, and defendant told Coombs that he did not think they had burned her. Defendant said the two of them then fell asleep until her boss came to pick her up.

Dr. Climaco, the physician who examined B.H., testified that she sustained multiple bruises and marks on her lower lip, left thigh, chest, right arm, and in her pelvic area. He also noticed a small redness about the diameter of a cigarette on the labia minora (inside lip) of her vagina.

Defendant testified to a different version of events than B.H. did. He said that he met B.H. about 10 years before and they lived together until July 1989, when they split up. However, even after they split, they would spend the night at each other's apartment and both had keys to each other's apartment. He eventually moved out of his apartment in May 1990 and lived with B.H. or his mother intermittently, spending four or five nights a week at B.H.'s residence. He would also baby-sit B.H.'s daughter, Jamie.

Defendant testified that on June 2, 1990, he and B.H. had made plans to go out dancing, but another employee at Al's asked B.H. to work for her that night. B.H. agreed and worked from 3 to 11 p.m.

Defendant went to Al's around 5 p.m. and stayed for the evening. B.H. came out to sit and talk with him and the others at his table during her breaks. After B.H. got off work, she refused to sit with another woman at defendant's table, and instead went into another room at Al's. Defendant followed B.H. and bought her a beer. Later, B.H. told him, " 'Let's get out of here and go to Madigan's.' "

Defendant continued that when they arrived together at Madigan's, B.H. went to play pool. Eventually, defendant got into an argument with B.H. over a pool bet. Defendant testified that B.H. was upset with him, and they started to leave Madigan's. However, when defendant stopped at the door to talk to a friend, B.H. started shouting again. Defendant said to her, "let's go home," but B.H. told him she was not going anywhere with him. The owner of the bar then told them to leave, and they did. Defendant estimated that he left Madigan's somewhere between midnight and 1:30 p.m.

Defendant testified that he then drove alone to his mother's house, located a few blocks from B.H.'s house, and immediately walked to her house. As he did so, he saw her approach in her car. He stopped her, and she rolled her window down. After they spoke for a moment, she asked him to get in the car. They drove to her house, went in, drank some soda and iced tea, and went into the bedroom. They turned the television on, undressed, and got into bed on their usual sides while naked. (Defendant added that they usually slept naked.) After they smoked a cigarette, he put his arm around her, held and kissed her, and they eventually engaged in sexual intercourse. Defendant said B.H. performed oral sex on him during this time, but that she did so consensually as she had done in the past.

When they finished, they went to the bathroom and washed up. However, when they got into bed again, B.H. rolled on top of defendant, and they had sex again. They again washed up and went to bed. As they lay in bed, they both smoked a cigarette and talked for a while. While still smoking, defendant dozed off momentarily, only to wake up and realize that he still held a cigarette in his hand. As he reached over B.H. to put the cigarette into an ashtray, some ashes fell off onto B.H. They brushed at them, but none of them burned her. They pulled the covers over them, and fell asleep with B.H.'s head on defendant's shoulder.

B.H.'s boss awakened them the next morning to pick B.H. up for work. When defendant woke up, B.H. had already started dressing. She told him she was late for work, kissed him good-bye, and told him that she loved him as she left. He slept until about 9:30 and then dressed and started working on the headboard in the garage. B.H.

came home around 1:30 that afternoon. They talked about arguing so much, both agreeing that they needed to stop arguing. B.H. then left to pick up Jamie.

Defendant did not see B.H. again until after he attempted suicide. He explained that he went out drinking alone that night and started dwelling on his problems. Defendant was operating a used tire-recycling operation, and the business had virtually failed. He also owed the hospital for the treatment he received when he broke his neck a few years before. Additionally, he owed a large sum in child support from when he was recovering from his broken neck. He claimed he had tried to modify his child support obligation, but had failed. He also claimed that he could not even afford $400 to hire the attorney to file bankruptcy for him. Finally, even though he claimed he had made up with B.H., he said he feared losing her again.

After getting drunk that night, he passed out in his van. The next morning, still feeling depressed, he continued drinking and lamenting over his problems. Those worries and the effect of the alcohol led him to try to kill himself. Using his key, he went into B.H.'s house and took several sleeping pills. After writing the note the police found, he passed out on B.H.'s bed and woke up in the hospital.

Defendant denied forcing B.H. to have sex with him, denied threatening her with a knife, and denied sticking a cigarette into her vagina. Defendant also presented several corroborating witnesses who testified that B.H. looked unhappy and became jealous at Al's when she saw defendant dancing with a female friend.

Defendant's sister, Rebecca Leckrone, testified at trial and corroborated defendant's claim that he lived with B.H. off and on during the months before the alleged rape occurred. She also testified about a conversation she had with B.H. soon after the events at issue occurred. When she had visited defendant in the hospital, he had asked her to deliver a note to B.H. When Leckrone delivered the note, B.H. asked Leckrone to meet with her later that evening so they could talk.

Leckrone testified that she went to B.H.'s house that night and B.H. told her a substantially different version of events than the one B.H. testified to. B.H. told Leckrone that defendant and she had argued at Madigan's over a pool bet and other things, that they were thrown out of Madigan's, and that when she saw defendant waiting near her house, she drove to her friend's house because she was scared of defendant.

B.H. told Leckrone that she later returned home, checked the house, found nothing, and went to bed without incident. She told

Leckrone that defendant woke her up soon after she fell asleep. B.H. said that, after discussing things, she and defendant " 'made up and made love.' " She did not mention anything about defendant's threatening her with a knife, raping her, or burning her with a cigarette. (We note that defense counsel did not first confront B.H. on cross-examination with the prior inconsistent statements that B.H. allegedly made to Leckrone. However, the State never objected to Leckrone's testimony regarding B.H.'s statements.)

According to Leckrone, immediately after B.H. told her that she and defendant had made up and made love, David Horrom walked into the room and interrupted their conversation. (Although B.H. had stopped dating Horrom earlier that spring, she had recently started dating him once again and continued dating him at least until the defendant's trial in October 1991.) Leckrone continued that with Horrom standing at the other end of the table, B.H. changed her story completely, now saying that defendant had raped her, threatened her with a knife, and burned her vagina with a cigarette.

Two employees of defendant's tire business testified that they knew defendant possessed a key to B.H.'s house when he lived with her on and off in the months before the alleged rape occurred. Upon returning defendant's truck to B.H.'s house, they would use defendant's key to B.H.'s house to return defendant's truck keys when nobody was at B.H.'s home. One employee testified that he saw defendant open B.H.'s door with his own key as late as a week before the alleged rape occurred. The employee added that defendant kept a lot of clothes at her house.

Over defense counsel's continued objection, B.H. also testified during the State's case in chief that defendant had previously threatened her with a knife in September 1989, over eight months prior to the alleged rape for which defendant was on trial. She testified as follows regarding this incident. The night she first went out with Horrom, defendant appeared at her residence while Horrom was still there. Defendant started yelling outside her door that he wanted to talk to her. She told him he could not come inside, but she would come out to talk to him if he stepped away from the door. He refused to do so, and instead broke her door down. He then grabbed B.H. and pinned her against the wall, choking her.

Horrom then put his hands up and said that he did not want any trouble. Defendant hit Horrom anyway, giving him a black eye. Defendant then went into the kitchen and emerged with the same knife B.H. said that he later used in June 1990 when he raped her. He came at B.H. and told her that she was not "going to fuck anyone

else." He also said that he would set the house on fire no matter who was in it and kill her. Then Dawn and Roger Skelton (B.H.'s housemates) arrived. Eventually, the police also arrived and arrested defendant. Dawn Skelton and Horrom also testified regarding the September 1989 incident and substantially corroborated B.H.'s version of events.

Defendant's version of these events differed significantly. He testified that the incident in September 1989 arose because B.H. had told him she wanted to get back together with him and invited him to come over to her house. When defendant did so, he saw Horrom with B.H. through the window. He opened the door quickly and strongly, and it accidentally fell off the hinges in his hand. He testified that he knew that the front door was unstable, but did not know how unstable until he opened it and accidentally broke it off its hinges.

After seeing Horrom with B.H., defendant asked her "What in hell is going on here?" B.H. brought defendant outside and explained the circumstances, but defendant was not mollified.

Defendant continued that the Skeltons then arrived as defendant followed B.H. back into the house, screaming at her. Once inside, he claims he saw Horrom move toward him out of the corner of his eye, threw his arm up to defend himself, and accidentally hit Horrom in the eye. The argument progressed and, in a fit of anger, he eventually went to the kitchen to get the knife. He emerged from the kitchen with it and told B.H. to "get a life jacket" because he was going to slash the waterbed so she and Horrom could not sleep together on it. However, he never carried out that threat, and the police eventually arrived and arrested him. He denied ever touching B.H. that night.

The State charged the defendant with the following five counts: (I) aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(2)) in that defendant, by threat of force, placed his penis in B.H.'s mouth, and in doing so, caused bodily harm to her; (II) home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11) in that defendant knowingly and without authority entered B.H.'s dwelling and remained inside while armed with a dangerous weapon until she returned, and then threatened B.H. with the knife; (III) home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a)(1)) in that defendant knowingly and without authority entered B.H.'s dwelling, waited for her to return, and then intentionally injured her by biting her lip; (IV) aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(2)) in that defendant, by threat of force, placed a cigarette in B.H.'s vagina, causing bodily harm to her by burning her; and (V) criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(1))

in that defendant by, threat of force, knowingly committed an act of sexual penetration by placing his penis in B.H.'s vagina.

On the above evidence, the jury acquitted defendant on counts I, II, and V, and convicted him on counts III and IV. Defendant jumped bond just before sentencing, but the trial court sentenced him in his absence to consecutive prison terms of 12 years for aggravated criminal sexual assault and 8 years for home invasion.

## II. ANALYSIS

### A. *Sufficiency of the Evidence*

Defendant first argues that the State did not prove him guilty beyond a reasonable doubt. The Illinois Supreme Court has recently held that the following standard applies to a challenge to the sufficiency of the evidence:

> "When faced with a challenge to the sufficiency of the evidence, the reviewing court applies the reasonable doubt standard as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261[, 478 N.E.2d 267, 277]. This standard, derived from *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, does not require the court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' (Emphasis in original.) [Citations.] [Instead,] the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins,* 106 Ill. 2d at 261[, 478 N.E.2d at 277; citation].) *** The standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts.' (*Jackson,* 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; [citation].)" (*People v. Campbell* (1992), 146 Ill. 2d 363, 374-75, 586 N.E.2d 1261, 1265-66.)

Therefore, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses, and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Campbell,* 146 Ill. 2d at 375, 586 N.E.2d at 1266; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.

■ When considered in accordance with the above criteria, we conclude that the record on appeal contains sufficient evidence for a rational jury to conclude that defendant committed aggravated criminal sexual assault and home invasion. Although defendant presented a different version of events than that of B.H. and presented witnesses who corroborated parts of his version, the jury could choose to believe B.H., and her account of events is sufficient evidence to support the jury's verdicts.

### B. *Evidence of Defendant's Other Crimes*

Defendant next argues that the trial court erred by allowing the State to present evidence of other crimes he allegedly committed. In particular, defendant argues that the trial court improperly allowed the State to elicit testimony regarding the September 1989 incident between defendant, B.H., and Horrom in which defendant allegedly struck Horrom and threatened B.H. with a knife. Defendant argues that this evidence was irrelevant and extremely prejudicial. We agree.

The admissibility of evidence of a defendant's other crimes is a topic the courts of review of this State frequently address. In *People v. Illgen* (1991), 145 Ill. 2d 353, 364-65, 583 N.E.2d 515, 519, the supreme court wrote the following on this subject:

"It is well established that evidence of other offenses is not admissible for the purpose of showing the defendant's disposition or propensity to commit crime. [Citation.] Such evidence is admissible, however, where relevant to prove *modus operandi*, intent, identity, motive or absence of mistake. [Citations.] In fact, this court has held that evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime."

Shortly before defendant's trial began, the State filed a motion *in limine* to bring to the trial court's attention its wish to introduce evidence of the September 1989 incident at B.H.'s residence. The State asserted in its motion that this evidence was admissible to show *"modus operandi*, intent, lack of consent, and corroboration."

Defendant objected to the State's motion, and the trial court conducted a hearing at which the State further explained its theory of admissibility. The State pointed out that both the September 1989 and the June 1990 incident involved the same victim, the same house, and the same knife. The State further argued that on each occasion defendant made similar threats, namely, that he would not let B.H. have relations with any other man. The State maintained that the September 1989 incident showed "the intent and lack of consent,

which [will] be the defense in this case and [will] corroborate [B.H.'s] statements." The trial court overruled defendant's objection, explaining as follows:

"I think [defendant's] prior conduct is between the same parties. It is not completely remote in time. It does show relationship[,] familiarity, design, course of conduct. I think these matters are matters that can come in[,] and the court will allow those to come in."

We hold that the trial court's analysis was flawed and its conclusion erroneous.

■■ In *Illgen*, the supreme court set forth the analytical approach courts should take when determining whether evidence of other crimes is admissible:

"We first consider the defendant's claim that the prior incidents were not probative of any proposition at issue in the action. As stated, evidence of prior bad acts is admissible only if relevant for any purpose other than to demonstrate the defendant's propensity to commit crime. [Citation.] Evidence is considered 'relevant' if it has any tendency to make the existence of any fact that is of consequence to the determination of an action more or less probable than it would be without the evidence. [Citation.] The defendant here was charged with first degree murder. The principal issue at trial was whether the defendant shot the victim with the mental state required for murder or whether the shooting was accidental, as the defendant claimed." *Illgen*, 145 Ill. 2d at 365-66, 583 N.E.2d at 520.

Following the *Illgen* analytical approach, we note that defendant here was charged with home invasion and aggravated criminal sexual assault of B.H. Because defendant never disputed either his presence in B.H.'s residence or engaging in sexual activities with B.H. on the night in question, the principal issue at trial was whether B.H. consented to that presence and those activities. On the facts of the present case, we fail to find how the events of September 1989 "make the existence of any fact that is of consequence to the determination of [defendant's guilt] more or less probable than it would be without the evidence." *Illgen*, 145 Ill. 2d at 365-66, 583 N.E.2d at 520.

The State's primary argument both at trial and now on appeal is that evidence of the September 1989 incident is admissible as *modus operandi*. In *People v. Rose* (1990), 198 Ill. App. 3d 1, 6-7, 555

N.E.2d 414, 417-18, the court discussed the admission of evidence of other crimes as *modus operandi* as follows:

> "*Modus operandi* refers to a pattern of criminal behavior so distinct that separate crimes are recognized as the work of the same person. If evidence of other crimes is offered to prove *modus operandi*, there must be some clear connection between the other crime and the crime charged which creates a logical inference that if the defendant committed those acts, he may have committed the act at issue. The inference is created when both crimes share peculiar and distinctive common features so as to earmark both crimes as the handiwork of the defendant. [Citation.]
>
> &ast;&ast;&ast;
>
> The *modus operandi* exception is often confused with the exception of common design. [Citation.] Common design refers to a criminal scheme of which the crime charged is only a part. [Citation.] The several crimes must have some degree of identity between the facts of the crime charged and those of the other offense in which the defendant was involved. [Citation.] For example, other offenses may be admitted to prove a defendant had a scheme to harass a victim in order to prove who instigated the crime being prosecuted."

We agree with the above analysis and find meritless the State's assertion that the September 1989 incident constitutes either *modus operandi* or common design evidence. Our research and experience reveal that the *modus operandi* exception arises most often when the identity of the perpetrator is at issue. (See *People v. Smith* (1991), 222 Ill. App. 3d 473, 483-84, 584 N.E.2d 211, 218-19; *People v. Willis* (1989), 184 Ill. App. 3d 1033, 1040-41, 540 N.E.2d 1080, 1084-85; *People v. Hall* (1989), 186 Ill. App. 3d 123, 127-30, 541 N.E.2d 1369, 1371-73.) Although the *modus operandi* exception can apply in nonidentification contexts, trial courts nonetheless should carefully scrutinize any such claimed application.

Regarding the *modus operandi* exception, the factual context of the September 1989 incident—defendant's breaking down the door of B.H.'s house upon seeing her with another man, and then striking him and threatening her with a knife—differs substantially from the context of the June 1990 incident for which defendant was on trial, namely, defendant's hiding in a closet in B.H.'s residence and, after she returned home, emerging to sexually assault her. These crimes hardly share "peculiar and distinctive common features so as to earmark both crimes as the handiwork" of the same person.

(*Rose*, 198 Ill. App. 3d at 6, 555 N.E.2d at 417-18.) Although these incidents have some things in common—same victim, location, and knife—the similarity of conduct as a whole, not the uniqueness of any single factor, is the key to determining the presence of the *modus operandi* exception. *People v. Smith* (1992), 236 Ill. App. 3d 1060, 1063, 602 N.E.2d 1388, 1391.

Regarding the common design exception, the discussion in *Rose* also makes clear that this exception does not apply to the present case because no "criminal scheme of which the crime charged is only a part" exists here (*Rose*, 198 Ill. App. 3d at 7, 555 N.E.2d at 418), nor does this record present any criminal scheme that connects the September 1989 and June 1990 incidents. Furthermore, the September 1989 incident showed nothing regarding any claimed intent of defendant or lack of consent by B.H. regarding the June 1990 incident.

On appeal, the State also argues that we should focus on the trial court's ruling that the September 1989 incident was admissible to "show relationship[,] familiarity, design, [and] course of conduct." We earlier rejected here any application of the "course of conduct" exception, and it appears that the trial court's reference to "design" might have been simply another way of referring to "intent." However, no matter whose version of events the jury might believe, defendant's *intent* to be in B.H.'s residence and to engage in sexual conduct with her was not disputed. Thus, evidence of the September 1989 incident possessed no relevancy regarding defendant's intent.

Regarding the last two reasons mentioned by the trial court—relationship and familiarity—we are not sure what the trial court meant by its reference to those terms, but in any event they do not constitute exceptions to the prohibition against admitting evidence of defendant's other crimes. We conclude that the evidence of the September 1989 incident was irrelevant for any purpose for which it was offered (and any other purpose we can think of), and that the jury likely considered it only as showing a propensity on defendant's part to commit crime.

In so concluding, we are mindful of the holding in *People v. Puhl* (1991), 211 Ill. App. 3d 457, 474, 570 N.E.2d 447, 458, as follows:

> "There is a well-established exception to the rule that evidence of other crimes is generally inadmissible. When prosecuting a sex-related offense upon a child, evidence of prior sexual acts between the defendant and the victim is admissi-

ble to show the familiar relationship between the parties and to corroborate the victim's testimony as to the act relied upon for conviction."

(See also *People v. McCarthy* (1991), 213 Ill. App. 3d 873, 881, 572 N.E.2d 1219, 1224; *People v. Cregar* (1988), 172 Ill. App. 3d 807, 821-22, 526 N.E.2d 1376, 1386.) The exception referred to in *Puhl* does not apply to the present case because (1) the victim, B.H., is not a child, and (2) the September 1989 incident did not involve a sex-related offense. Furthermore, B.H. testified that she had dated defendant for over eight years and had lived with him during at least four of those years. Their relationship hardly needed further clarification. Accordingly, any probative value evidence of the September 1989 incident might possess was clearly outweighed by the prejudicial effect of that evidence, which was to show defendant as a violent man with a propensity to commit crime—precisely what the rule regarding other crimes evidence was designed to keep out.

" 'Erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal.' " (*People v. Eveland* (1989), 181 Ill. App. 3d 458, 463, 536 N.E.2d 1280, 1282, quoting *People v. Lindgren* (1980), 79 Ill. 2d 129, 140, 402 N.E.2d 238, 244.) Because we view the State's case against defendant as far from overwhelming, we cannot conclude that the record before us affirmatively shows that the error in admitting the September 1989 incident was not prejudicial to defendant. (*Lindgren*, 79 Ill. 2d at 140, 402 N.E.2d at 244.) Accordingly, we reverse and remand for a new trial at which that evidence will not be presented.

As part of our conclusion that reversal is required because of the prejudicial effect to defendant of the erroneously admitted evidence of the September 1989 incident, we note that the jury never received any instruction limiting its consideration of that evidence. (See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981) (hereafter IPI Criminal 2d).) Although we do not hold that the trial court's failure to give IPI Criminal 2d No. 3.14 *sua sponte* is plain error, we point out that had this limiting instruction been given, it would have lessened the impact of the improperly admitted evidence. *People v. Musitief* (1990), 201 Ill. App. 3d 872, 877, 559 N.E.2d 520, 525.

■ Because of the significant prejudice to a defendant's case that the admission of other crimes evidence usually risks, we hold that trial courts should not only instruct the jury in accordance with IPI Criminal 2d No. 3.14 at the close of the case, but also

orally from the bench (unless defendant objects) at the time the evidence is first presented to the jury.

### C. *Hearsay Statements Made by the Victim to Medical Personnel and Police Officers*

Although we have decided to reverse defendant's convictions and remand for a new trial, we will address other issues defendant raises on appeal because they might arise again on retrial. The first such issue is defendant's argument that the trial court erroneously admitted hearsay statements B.H. made to medical personnel and a police officer.

### 1. The Victim's Statements to Medical Personnel

Section 115—13 of the Code of Criminal Procedure of 1963 (Code) provides the following:

"In a prosecution for violation of Section 12—13, 12—14, 12—15 or 12—16 of the 'Criminal Code of 1961,' statements made by the victim to medical personnel for purposes of medical diagnosis or treatment[,] including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." (Ill. Rev. Stat. 1991, ch. 38, par. 115—13.)

In *People v. White* (1990), 198 Ill. App. 3d 641, 655-56, 555 N.E.2d 1241, 1250-51, *aff'd* (1992), 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736, we held that courts should interpret section 115—13 of the Code liberally so as to not parse statements made by the victim to medical personnel. The statute states that the victim's statements—to be admissible—must be pertinent to diagnosis or treatment, which includes statements containing information that might explain the causes of the victim's injuries.

 Dr. Climaco, the doctor who treated B.H. in the hospital, and Julia Wilham and Judy Worth, the nurses who also treated B.H., all testified to what B.H. told them about the incident. Clearly B.H.'s statements here regarding the background and cause of the her injuries—such as her complaint of being raped and the particulars of her assailant's conduct—fall within the statutory reach because such statements informed medical personnel both where to look and for what to look when they examined or treated this victim. The information regarding defendant's placing a cigarette in B.H.'s vagina pertained to the burn on her vagina; the information regarding forced

sexual intercourse informed them that they should examine her for injuries; the information regarding the knife might explain the scratches she had. We thus find no error in the trial court's allowing Dr. Climaco and the nurses to testify about B.H.'s statements to them.

Defendant cites *People v. Mitchell* (1990), 200 Ill. App. 3d 969, 975-76, 558 N.E.2d 559, 564, in support of his interpretation of section 115—13 of the Code. In *Mitchell*, the court held that the trial court erred by admitting hearsay testimony of medical personnel of what the victim said the defendant had told her as he entered her apartment to rob and rape her. This information included allowing medical personnel to testify that the victim said that the defendant had told her that " 'if she wouldn't go out with him, he would take what he wanted.' " *Mitchell*, 200 Ill. App. 3d at 974, 558 N.E.2d at 563.

Although the *Mitchell* court held it error to admit this statement, the court limited its holding to this single statement, and thus did not hold it error for the doctor in that case to testify that the victim said that the defendant had raped her at knife point. (*Mitchell*, 200 Ill. App. 3d at 976, 558 N.E.2d at 564.) *Mitchell* thus provides no support for defendant's argument.

### 2. The Victim's "Prompt Complaint" and Prior Consistent Statements

The statement of a rape victim that she has been raped is admissible under the "prompt complaint of a rape" exception to the hearsay rule. This exception "allows into evidence a declaration by a rape victim that she was raped which was made at a time too remote to be considered a spontaneous utterance." (*People v. Lawler* (1991), 142 Ill. 2d 548, 560, 568 N.E.2d 895, 901.)

> "In such cases, evidence that a complaint was made is admissible to corroborate the complainant's testimony. The reasoning underlying the exception is that it is entirely natural that the victim of a forcible sexual assault would speak out regarding it and, conversely, that the failure to do so would, in effect, be evidence that nothing violent had occurred." *People v. Evans* (1988), 173 Ill. App. 3d 186, 199, 527 N.E.2d 448, 457.

However, the victim must have made the complaint of her own accord and without any inconsistent or unexplained delay. (*Evans*, 173 Ill. App. 3d at 199, 527 N.E.2d at 457.) Further, because "the sole purpose of the exception is to rebut any presumption which might arise from the complainant's silence, only the fact of the complaint is admissible[,] neither the details of the complaint nor the identity of

the named perpetrator is admissible." *Evans*, 173 Ill. App. 3d at 199-200, 527 N.E.2d at 457.

In the present case, the State called Officer Gehrets and, after asking the ordinary foundational questions, then asked the following question: "I would like for you to explain in as much detail as possible what [B.H.] told you happened to her[,] *** beginning with the first contact she had ***, if any, with [defendant] on that night?" Gehrets then told the entire story as B.H. had related it to him, from the argument over pool at Madigan's to when he accompanied B.H. to find defendant sprawled on her bed after he tried to commit suicide.

■ As defendant argues on appeal, Gehrets' testimony about what B.H. told him obviously falls well outside the prompt complaint exception for two reasons. First, B.H. did not make her complaint to Gehrets without an unexplained delay. Instead, she made it only after going through a day's normal events, at the end of which she finally went to the hospital and ultimately made her complaint to Gehrets. Indeed, defendant may have wanted to demonstrate B.H.'s delay himself, which might explain his failure to object at trial to Gehrets' hearsay testimony. Second, and more important, Gehrets' testimony was not limited to the fact that B.H. had merely made a complaint, but rather went into great detail—as requested by the prosecutor—regarding what she said had happened. Thus, on retrial, the trial court should not admit this detailed hearsay testimony of Gehrets on direct examination unless defendant again fails to object.

We note that Gehrets' testimony might be admissible in rebuttal as evidence of a prior consistent statement by B.H., if the trial court views Leckrone's testimony of B.H.'s statements to her as suggesting recent fabrication on the part of B.H. Although " 'evidence of statements made prior to trial for the purpose of corroborating testimony at trial is inadmissible[,]' [e]xceptions to this rule allow the admission of prior consistent statements to rebut a charge or inference that (1) the witness is motivated to testify falsely or (2) that the in-court testimony is a recent fabrication." *People v. Shum* (1987), 117 Ill. 2d 317, 340-41, 512 N.E.2d 1183, 1190, quoting *People v. Emmerson* (1983), 97 Ill. 2d 487, 501, 445 N.E.2d 41, 47.

D. *Limiting the Extent to Which Defendant Could Impeach the Victim about Her Previously Filing a False Complaint with the Police*

Defendant next argues that the trial court erroneously limited the extent to which he could impeach B.H.'s credibility with her former conviction for disorderly conduct based on filing a false complaint with the police. The trial court limited the presentation of that matter

to a statement of the existence of the prior conviction and an explanation that "it entailed a false report that [B.H.] made to the police." The court refused to allow defendant to impeach B.H. by delving into the facts underlying that conviction. Defendant argues that the trial court erred by doing so because these facts would have shed further light on B.H.'s lack of credibility, as shown by the offer of proof he presented.

Defendant's offer of proof regarding B.H.'s disorderly conduct conviction revealed that in 1981, B.H. lived with Terry Heath. She reported to the police that as she drove to Springfield with Heath, he beat her on the head and face, and then pulled over to the shoulder of the highway to beat her more. She complained that she received several injuries as a result, including bruises and contusions on her face, cheek, and right thigh. However, none of these complaints was true, and B.H. again so admitted during defendant's offer of proof. Shortly after these events, she broke up with Heath and started dating defendant.

The trial court has the discretion to allow a party to impeach a witness based on that witness' conviction for a prior felony or other crime involving dishonesty if that conviction or the witness' release date from prison occurred within 10 years of the testimony. (*Lawler*, 142 Ill. 2d at 563, 568 N.E.2d at 902.) The court determines in its discretion whether the impeachment should include the court, date, nature of offense, and sentence received. (*People v. Enoch* (1991), 146 Ill. 2d 44, 55, 585 N.E.2d 115, 121; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §609.6, at 386 (5th ed. 1990).) (For an extensive discussion of factors a court may wish to consider in exercising its discretion, see *People v. Kunze* (1990), 193 Ill. App. 3d 708, 728-36, 550 N.E.2d 284, 297-303 (Steigmann, J., specially concurring).) Because B.H.'s conviction at issue clearly involved a false statement, the court properly determined that B.H.'s conviction was admissible. The question presented is whether the court abused its discretion by unduly restricting the details of the prior conviction.

■ B.H.'s prior conviction impeaches her credibility by showing that, at least once in the past, she made a false police report. The additional facts underlying that conviction show that B.H. brought false allegations that another former boyfriend beat her just before their relationship ended. However, this false report occurred nine years before the incident at issue in the present case and involved a different boyfriend.

Although as trial judges we might be inclined to admit defendant's proffered details regarding B.H.'s prior conviction, we stand in

a different position as appellate judges. As a court of review, we cannot engage in second-guessing the trial court. Instead, we must decide whether the trial court abused its discretion in its ruling. On this record—albeit the issue is a close one—we cannot conclude that the trial court abused its discretion in ruling as it did.

### III. CONCLUSION

For the reasons stated, we reverse defendant's conviction and remand for a new trial.

Reversed and remanded.

COOK and GREEN, JJ., concur.