NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190417-U

NO. 4-19-0417

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 19, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| BLAKE E. MARIANI, | ) | No. 18CF119 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) The State's evidence was sufficient to establish defendant's guilt of the charged offense beyond a reasonable doubt.

(2) The trial court complied with Rule 431(b) (eff. July 1, 2012) when questioning potential jurors during *voir dire*.

(3) Defendant failed to establish either the occurrence of plain error or ineffective assistance of counsel with respect to the manner in which the jury was instructed.

¶ 2   Following a jury trial, defendant, Blake E. Mariani, was found guilty of unlawfully possessing, with the intent to deliver, 15 to 100 grams of a substance containing heroin (720 ILCS 570/401(a)(1)(A) (West 2016)) and the trial court sentenced him to nine years in prison. Defendant appeals, arguing (1) the State failed to prove his guilt beyond a reasonable doubt, (2) the court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) when questioning potential jurors during *voir dire*, and (3) either (a) the court erred by failing to *sua sponte* instruct the jury

regarding the limited admissibility of certain evidence or (b) defense counsel provided ineffective assistance by failing to seek such instructions. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4        In August 2018, defendant was indicted on one count of unlawful possession of heroin with intent to deliver (720 ILCS 570/401(a)(1)(A) (West 2016)) "in that [he] knowingly possessed with the intent to deliver 15 grams or more but less than 100 grams of a substance containing heroin[.]" The State later added a second count, charging defendant with the same offense based on a lesser weight of heroin, but the trial court dismissed that count prior to trial on the State's motion. Both charges were based on allegations that in April 2018, law enforcement officers executed a search warrant on a residence where defendant was living with two other individuals and discovered 21.3 grams of a chunky brown substance containing heroin.

¶ 5        In March 2019, defendant's jury trial was conducted. During *voir dire*, the trial court questioned all potential jurors as follows:

> "The next four questions I have deal with some fundamental principles of our criminal justice system. And so the first one is that the defendant is presumed innocent of the charge against him. The presumption of innocence. Does anyone not understand and accept this principle? If anyone does not understand and accept this principle, please raise your hand. Everyone understands it. Everyone accepts it.
>
> The next principle. Before the defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt. If anyone does not understand and accept this principle, please raise your hand. Everyone accepts it. Everyone understands it.

The next principle ***. The defendant *** has the right to not have to prove any evidence on their own behalf. The defendant is not required to offer any evidence on his own behalf. The burden of proof, as I stated, is on the State. The burden of proof is not on the defendant to prove that he's not guilty, the burden is on the State to prove that the defendant is guilty. So does anyone not understand and accept this principle? If so, please raise your hand. Everyone understands it. Everyone accepts it.

The next principle, the defendant's failure to testify cannot be held against him. The defendant under the Constitution has a right to remain silent. Does anyone not understand and accept this principle? If anyone does not understand and accept this principle, please raise your hand. All understand it. All accept it."

¶ 6 At trial, the State's evidence showed defendant lived with two individuals—Michael Turner and Jerrit Kamp—in a two-story residence rented by Kamp and located at 210 North Franklin Street in Roanoke, Illinois (Franklin Street residence). Turner and defendant had bedrooms on the first floor of the residence while Kamp's bedroom was located on the second floor. Shortly before 5 a.m. on April 4, 2018, law enforcement officers, who were part of a Multi-County Narcotics Enforcement Group known as the MEG unit, executed a search warrant on the Franklin Street residence. During the search, officers found "a bag" of suspected heroin on the floor of the residence's first floor "front bedroom," which belonged to Turner. A scale was also found inside that bedroom, and several hypodermic syringes were observed "throughout the residence." Exhibits in the form of a photograph of the suspected heroin, which was taken at the scene, and the actual substance (People's exhibit No. 11) were admitted into evidence.

¶ 7 During the search, MEG unit members further found two pieces of mail addressed

to defendant. One of those pieces of mail was addressed to defendant at a Peoria, Illinois, address and located in the same bedroom as the suspected heroin. The second piece of mail was addressed to defendant at the Franklin Street address and found in a different first-floor bedroom.

¶ 8           Patrick Murphy testified he was a member of the MEG unit and involved in executing the search warrant on the Franklin Street residence. One of his functions was to provide "pre-search-warrant surveillance." While watching the Franklin Street residence before the execution of the search warrant, Murphy observed a vehicle arrive at the residence shortly before 5 a.m. He did not see who occupied the vehicle or who exited it.

¶ 9           Murphy further testified that when the search warrant was executed, defendant was located inside the Franklin Street residence. He was taken to Murphy's squad car and, after being read his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), reported he "did not know anything about any drugs inside of the residence," "was a recovering opioid addict," and had moved into the Franklin Street residence the night before "to try to get clean with the help of the residents in the house."

¶ 10          Joni Little, a forensic scientist for the Illinois State Police, testified for the State as an expert in drug chemistry analysis. In June 2018, she performed analysis on People's exhibit No. 11, the bag of suspected heroin found at the Franklin Street residence. According to Little, the exhibit consisted of "[a] plastic bag containing brown chunks." She stated she emptied the bag and determined that the "chunks" weighed 21.3 grams.

¶ 11          Little testified she then "took four different samples" from People's exhibit No. 11. With three of the samples, she performed "different color chemical tests," which she described as "preliminary tests" that give an indication of what a substance might be. Each "color chemical test" Little performed indicated that there was the presence of heroin in the substance tested;

- 4 -

however, those tests were not conclusive. Little testified she next performed a "[g]as chromatography, mass spectrometry" test. She stated that test was positive for the presence of heroin and, also, a conclusive test. As a result of her testing, Little opined People's exhibit No. 11 contained "21.3 grams of brown chunks positive for the presence of heroin."

¶ 12 On cross-examination, Little stated she tested "representative samples" from People's exhibit No. 11 for the presence of heroin. She viewed the contents of the exhibit "as a whole," stating "it's not like [there were] individual bags of chunks." Little agreed there was more than one brown chunk in the bag and that that she weighed all the "chunks" together. Further, she asserted she did not know "how many different pieces of the sample there [were]."

¶ 13 On redirect examination, Little testified it was her opinion that all of the contents of People's exhibit No. 11 was "a substance containing heroin." The entire substance was contained in one bag rather than multiple individual bags. She further stated as follows: "If it were one piece, I would have called it just a brown chunk. But the fact that I called it chunks means that it was probably torn a little bit, torn into powdery pieces."

¶ 14 Kamp also testified for the State. He acknowledged living at the Franklin Street residence and being arrested and charged with possession of heroin with the intent to deliver, a Class X felony, after the house was "raided" in April 2018. However, he acknowledged entering "into a contract agreement for cooperation" with the State. Pursuant to that agreement, Kamp was to provide truthful testimony regarding the circumstances surrounding and leading up to the execution of the April 2018 search warrant and the State would allow him to enter an open guilty plea to the lesser charge of delivering between one and five grams of heroin, a Class 1 felony. Kamp testified that after he pleaded guilty to that lesser charge, the trial court sentenced him to five years' probation. He also served 183 days in jail.

¶ 15 Kamp acknowledged being a heroin user. He testified he first met Turner, whom he described as "the one that had all the drugs," when he fixed Turner's car and Turner provided him with heroin as payment. Shortly thereafter, Turner's house was "raided in Peoria" by the police. Turner needed a place to stay, and Kamp offered his residence. Kamp stated Turner moved into the Franklin Street residence around the beginning of 2018 and brought defendant with him. By April 2018, defendant and Turner had been living with Kamp for "over three months." While living together, Kamp and defendant used heroin, but not Turner. On the morning of April 4, 2018, heroin was in the Franklin Street residence.

¶ 16 According to Kamp, the three roommates were involved in selling heroin "pretty much right away" after Turner and defendant moved in. He testified that both he and defendant sold heroin to people who called Turner's phone, stating he would take "bags" to people and defendant would also "go and meet people" or ride with Kamp "[t]o take drugs to people." Kamp stated the heroin he delivered was given to him by Turner. "Every once in a while," defendant would give Kamp heroin and tell him to go deliver it. According to Kamp, defendant also received that heroin from Turner. Kamp testified he started dealing heroin because he "was sick." Additionally, he asserted that "Turner kind of ran the house" and "would threaten people to come and hurt you if you didn't do certain things." Kamp described Turner as "big," weighing 500 to 600 pounds. Because of Turner's threats, Kamp was afraid for his life and lives of his family members.

¶ 17 Kamp further testified that he and defendant would go with Turner to Chicago to meet people and get heroin. Kamp drove and they rode in his vehicle. He stated they would "sit somewhere" while Turner made a phone call. Then, either defendant or Turner would go meet someone and get the drugs. However, Kamp testified that because Turner "was a big dude" he did

not "move a lot and get out [of] the car a lot" so defendant would typically go inside and get the drugs for him." Kamp stated he was unsure how much Turner would get at one time but described it as "a lot" and "[s]everal grams." He estimated that trips to Chicago to get heroin occurred every two or three weeks.

¶ 18 According to Kamp, after returning with the heroin to the Franklin Street residence, Turner would go into his room and "most of the time [defendant] would go in there" too. Kamp noted that when they received heroin from Chicago, it was in a single bag. He assumed Turner and defendant were in the bedroom "bag[ging]" the drugs up, *i.e.*, separating the drugs into smaller quantities to "have it ready." Then, when Turner would get calls, Kamp and defendant "would run [the drugs] to people." Sometimes, Turner would also go out and sell drugs, but he rarely went by himself.

¶ 19 Kamp denied that he ever received any money from selling heroin. Instead, Turner would give Kamp and defendant heroin for their own personal use. Kamp maintained that neither he nor defendant ever had "exclusive possession of the heroin in the house." Rather, it was Turner who "had it" and was "running th[e] show." Kamp stated the "bulk" of the heroin never left Turner's room or his person.

¶ 20 Albert Holocker testified he was a detective with the Woodford County Sheriff's Office, was a MEG unit member, and participated in the execution of the April 2018 search warrant at the Franklin Street residence. According to Holocker, MEG unit officers investigated narcotics cases, performed controlled and undercover drug buys, and executed search warrants. He stated he had been a MEG unit member for a year and "did narcotics work within the [sheriff's] department for a year before that." Holocker estimated he had been involved in the execution of over 50 search warrants and, as a narcotics officer, had spoken to "well over 150" heroin users

regarding "how they use, how much they spend, [and] how much they \*\*\* use."

¶ 21        In Holocker's experience, most heroin users carried only dose amounts of heroin at one time, like a tenth of a gram up to a half gram, and not bulk amounts of the drug. He stated 21 grams "wouldn't be a user amount." Holocker further testified that he had spoken with numerous drug dealers who "have explained their packaging and methods." He stated that, typically, drug dealers "go to source cities" like Chicago or St. Louis to obtain drugs. They buy larger amounts of drugs then "break it down into" smaller quantities to sell. Holocker testified that in the Woodford County, Illinois, area, two tenths of a gram of heroin sold for $40 to $50. He believed the "going rate" for an ounce of heroin, *i.e.*, 28 grams, was $1500. Holocker opined that 21.3 grams of a substance containing heroin was indicative of "a possession with intent to deliver amount." He did not believe a user would be in possession of that high of a quantity of narcotic.

¶ 22        Holocker further testified that around 8 a.m. on April 4, 2018, defendant agreed to speak with him at the Woodford County jail. Defendant reported waking up around midnight on the morning the search warrant was executed and noticing that his roommates were gone. At some point, two individuals showed up, who defendant assumed wanted heroin because "they had been there for that purpose before." Defendant maintained Turner and Kamp returned to the Franklin Street residence around 5 a.m. He asserted if law enforcement officers "were to have found anything more than a couple of grams of heroin [in the residence], that mean[t] [Turner and Kamp] had just gone to Chicago to re-up, to re-supply their stock of heroin."

¶ 23        According to Holocker, defendant explained that he had gone with Turner and Kamp to Chicago on several occasions. During those trips, Turner would have Kamp or defendant "meet with the supplier and actually purchase the drugs from a gentleman named Coach." Defendant estimated the Chicago trips occurred about once a week and that they purchased about

25 grams of heroin at a time. He stated the last time he had gone with Turner and Kamp to Chicago was about five or six days before the search warrant was executed.

¶ 24 Holocker stated defendant also admitted that Turner "would have [defendant and Kamp] deliver heroin to clients." Defendant acknowledged delivering heroin to others "several times" and stated he received heroin in exchange for making those deliveries. Upon questioning by the State, Holocker further testified as follows:

"Q. Did—based upon the conversation that you had with the defendant[,] was it clear or not clear whether he knew heroin was in the house?

A. It was abundantly clear he knew heroin was in the house, as well as the defendant would be expected—when he described if we found more than 2 grams, 2 or 3 grams, that meant that they just went and re-upped, meaning he knew how much heroin was left before [Turner and Kamp] left to go get more.

Q. So based on everything you—the interview you had with him and the knowing what you—the evidence as far as the weight, and everything like that, would you have an opinion whether or not all three of these individuals were intending to deliver this heroin?

A. I think they were all delivering heroin, yes."

¶ 25 On cross-examination, Holocker clarified that it was his understanding from speaking with defendant that if there was more than two or three grams of heroin located in the Franklin Street residence, that meant Turner and Kamp "just returned from Chicago from re-upping" their heroin supply, and that their trip occurred within hours of the execution of the search warrant.

¶ 26 After the State rested its case, defendant elected not to testify and rested his own

case. During closing arguments, the State argued defendant was guilty of the charged offense based on his constructive possession of, with intent to deliver, the substance containing heroin. It also argued defendant's guilt based on a theory of accountability, asserting he was legally responsible for the actions of both Turner and Kamp. The State submitted jury instructions consistent with its arguments on both constructive possession and accountability, which were given to the jury.

¶ 27       Ultimately, the jury found defendant guilty of the charged offense. In June 2019, the trial court sentenced him to nine years in prison. The record reflects defendant filed neither a posttrial nor a postsentencing motion.

¶ 28       This appeal followed.

¶ 29                    II. ANALYSIS

¶ 30              A. Sufficiency of the Evidence

¶ 31       On appeal, defendant first argues the State failed to prove him guilty beyond a reasonable doubt of the charged offense—possession, with the intent to deliver, 15 to 100 grams of a substance containing heroin. Specifically, he asserts the State failed to establish that (1) he actually or constructively possessed the substance at issue, (2) he was legally accountable for the actions of those who did possess the substance at issue, and (3) the amount of the substance at issue was between 15 to 100 grams.

¶ 32       For the reasons that follow, we find the State presented sufficient evidence to establish both defendant's guilt based on a theory of accountability and that the weight of the controlled substance at issue was between 15 and 100 grams. Accordingly, defendant's challenge to the sufficiency of the evidence lacks merit.

¶ 33       "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "When a defendant challenges

the sufficiency of the evidence, a court of review must determine whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* "It is not the role of the reviewing court to retry the defendant" (*id.*) and "a reviewing court must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Eubanks*, 2019 IL 123525, ¶ 95, 160 N.E.3d 843). Reversal of a conviction is only warranted where "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Gray*, 2017 IL 120958, ¶ 35.

¶ 34        As stated, defendant was charged with, and found guilty of, possessing, with the intent to deliver, between 15 to 100 grams of a substance containing heroin. (720 ILCS 570/401(a)(1)(A) (West 2016)). "To sustain a conviction for unlawful possession with intent to deliver a controlled substance, the State must prove beyond a reasonable doubt (1) the defendant had knowledge of the presence of the controlled substance; (2) the controlled substance was in the immediate possession or control of the defendant; and (3) the defendant intended to deliver the controlled substance." *People v. Warren*, 2016 IL App (4th) 120721-B, ¶ 64, 55 N.E.3d 117 (citing *People v. Robinson*, 167 Ill. 2d 397, 407, 657 N.E.2d 1020, 1026 (1995)). The weight of the heroin was also an essential element of the offense. See *People v. Jones*, 174 Ill. 2d 427, 428-29, 675 N.E.2d 99, 100 (1996) ("When a defendant is charged with possession of a specific amount of an illegal drug with intent to deliver and there is a lesser included offense of possession of a smaller amount, then the weight of the seized drug is an essential element of the crime and must be proved beyond a reasonable doubt.").

¶ 35                                    1. *Accountability*

¶ 36        A person may be held legally accountable for another's conduct when "either

- 11 -

before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2016).

> "When [two] or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." *Id.*

¶ 37 Defendant argues the evidence was insufficient to establish his guilt based on an accountability theory because, at most, he had knowledge of only two to three grams of heroin being "left" in the residence and was not aware of Turner and Kamp's trip to obtain more of the drug shortly before the execution of the search warrant on April 4, 2018. He maintains the State's evidence proved only that he "might have been predisposed to deliver heroin if Turner had chosen to involve him" but not that he possessed the "specific intent" to possess and deliver the alleged 21.3 grams of suspected heroin ultimately found during the search.

¶ 38 However, "under the Illinois accountability statute, the State may prove a defendant's intent to promote or facilitate an offense by showing *either* (1) that the defendant shared the criminal intent of the principal, or (2) that there was a common criminal design." (Emphasis in original.) *People v. Fernandez*, 2014 IL 115527, ¶ 21, 6 N.E.3d 145. " 'Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction

- 12 -

for an offense committed by another.' " *Id.* (quoting *In re W.C.*, 167 Ill. 2d 307, 338, 657 N.E.2d 908, 924 (1995)); see also *People v. Houston*, 258 Ill. App. 3d 364, 369, 629 N.E.2d 774, 779 (1994) ("[T]he State need only prove the accused had the specific intent to promote or facilitate *a* crime. Once the State proves the accused intended to promote or facilitate *a* crime, it has established the accused's responsibility for *any* criminal act done in furtherance of the intended crime." (Emphases in original.))

¶ 39       Here, we find *People v. Burke*, 136 Ill. App. 3d 593, 483 N.E.2d 674 (1985), instructive. In that case, the defendant was found guilty of possession of cannabis with intent to deliver and possession of a controlled substance after several controlled drug purchases involving her husband and the discovery of cannabis and LSD in her home during the execution of a search warrant. *Id.* at 595-96. On appeal, the defendant challenged the sufficiency of the evidence against her, arguing "the substances found in the home were under the control of her husband, for his personal use and sale, and that she engaged in no affirmative act to aid, abet, or encourage his drug transactions." *Id.* at 598. More specifically, she maintained she should not have been convicted of possession with intent to deliver under an accountability theory, asserting "her mere presence [at the scene did] not render her accountable for the offenses committed by her spouse." *Id.* at 600-01.

¶ 40       This court rejected the defendant's argument, noting "[t]he State's theory of the case was that of a family drug business, or what might be termed a 'joint enterprise,' with elements of common design." *Id.* at 601. Further, we stated as follows:

> "[I]t has been held that the trier of fact may infer an agreement which would support accountability for a criminal offense based upon the conduct of the accused in attaching himself to a group which combines to act in circumstances showing a common design to do unlawful acts to which a group assents. [Citation.] Whether

- 13 -

the evidence shows proof of acts showing common purpose is a question for the trier of fact, and proof of such acts need not be supported by express words of agreement, but can be drawn from the circumstances surrounding the act. [Citation.]" *Id.* at 601-02.

Ultimately, we held the evidence was sufficient to sustain the defendant's conviction because it showed the defendant "admitted her awareness of what was going on," a "substantial amount" of the drug was discovered in the master bedroom closet of the residence, the drugs were packaged in small plastic bags, and the defendant benefited from the drug sales. *Id.* at 602.

¶ 41　　　　In this case, even if the evidence failed to establish defendant's actual or constructive possession of the controlled substance at issue, it nevertheless sufficiently demonstrated his accountability for Turner's possession with intent to deliver that substance. The evidence indicated defendant, Turner, and Kamp had an *ongoing* agreement to sell heroin kept at the Franklin Street residence. The three resided together, traveled to Chicago at regular intervals to purchase heroin and "re-up" their supply, and both defendant and Kamp delivered heroin to individuals who contacted Turner. In exchange for making deliveries of the drug, defendant and Kamp received heroin for their own personal use. Evidence clearly showed defendant's awareness that heroin was kept at the residence, that there would be heroin in the residence on the day of the search, and the manner through which more heroin was regularly obtained to perpetuate a heroin-selling agreement between the three men.

¶ 42　　　　Further, as argued by the State, it is possible the jury determined defendant's statements to Holocker—that he was aware of only two to three grams of heroin in the residence and not a larger amount—was a self-serving attempt to minimize his culpability. Ultimately, however, even if the jury accepted those statements as true, the evidence still amply demonstrated,

through both Kamp's testimony and defendant's statements to Holocker, that defendant attached himself to a group (Turner and Kamp) with an ongoing common criminal design to possess and sell heroin. From the evidence presented, a rational trier of fact could infer the existence of an agreement that supported defendant's accountability for Turner and Kamp's actions in furtherance of that agreement in possessing, with the intent to deliver, the specific controlled substance at issue in this case. Accordingly, the State presented sufficient evidence of defendant's guilt based on an accountability theory.

¶ 43                           2. *Weight of the Controlled Substance*

¶ 44        As indicated, defendant also argues the State failed to sufficiently establish that the weight of the substance containing heroin found at the Franklin Street residence was at least 15 grams. Defendant maintains that because Little, the State's forensic scientist, conclusively tested only one of multiple "chunks" of the suspected heroin, and the State presented no evidence regarding the "chunks' homogeneity," the evidence was insufficient. Again, we disagree.

¶ 45        "A chemist *** generally need not test every sample seized in order to render an opinion as to the makeup of the substance of the whole." *People v. Jones*, 174 Ill. 2d 427, 429, 675 N.E.2d 99, 100 (1996). Random testing of seized samples of a suspected drug are "permissible when the seized samples are sufficiently homogenous so that one may infer beyond a reasonable doubt that the untested samples contain the same substance as those that are conclusively tested." *Id.* "However, when such samples are not sufficiently homogenous, a portion from each container or sample must be tested in order to determine the contents of each container or sample." *Id.*

¶ 46        Defendant primarily relies on two cases to support his contention that random testing of the contents of the bag of suspected heroin was insufficient in this case. First, in *Jones*, the defendant was convicted of possessing with the intent to deliver 1.4 grams of cocaine. *Id.* at

428. Evidence in the case showed the defendant was arrested for possessing five separate packets that each contained a white rocky substance believed to be a controlled substance. *Id.* Only two of the five packets were subjected to chemical testing. *Id.* Both of those packets tested positive for the presence of cocaine and had a combined weight of 0.59 grams. *Id.* The combined weight of all five packets, including the three that were untested, was 1.4 grams. *Id.*

¶ 47        On review, the supreme court held the State "failed to test a sufficient number of packets to prove beyond a reasonable doubt that [the] defendant possessed one gram or more of cocaine." *Id.* at 430. It found that the testing of only two of the packets did not support an inference that the same substance was in all five packets and whether the three untested packets "may have contained cocaine or mere look-alike substances [was] pure conjecture." *Id.*

¶ 48        Second, defendant relies on the First District's decision in *People v. Adair*, 406 Ill. App. 3d 133, 940 N.E.2d 292 (2010). In that case, after being arrested with a bag containing 24 pills of different colors and markings and some loose powder, the defendant was found guilty of possessing 15 to 200 pills of methylenedioxymethamphetamine (MDMA) and 5 to 15 grams of methamphetamine. *Id.* at 134. On review, the defendant argued "the State failed to prove that he possessed at least 15 pills containing MDMA and at least 5 grams of methamphetamine, where the forensic chemist commingled the nonhomogeneous pills before testing for each controlled substance." *Id.* at 137. The First District agreed, noting that after the pills and powder were weighed together, "[t]he chemist then crumbled portions of each individual pill and fragment into a representative sample dish, which also contained a portion of the loose powder," and tested for the presence of each controlled substance. *Id.* at 139. Relying on *Jones*, the court stated that "[w]hen distinct samples are seized, a representative sample of each distinct sample must be tested to conclusively determine the chemical composition of that sample." *Id.* at 140. It held that, in the

case before it, "at the very least[,] each color grouping of pills had to be treated as a separate sample and tested independently for the presence of each controlled substance." *Id.*

¶ 49        Conversely, the State cites *People v. Tilley*, 2011 IL App (4th) 100105, ¶ 8, 958 N.E.2d 1123, where the defendant was found guilty of participating in manufacturing between 100 and 400 grams of a substance containing methamphetamine. Evidence in the case showed law enforcement officers searched the defendant's residence and found a gift bag containing a "chunky powder" that field-tested positive for methamphetamine and weighed 391.1 grams. *Id.* ¶ 3. The "chunky powder" was described as consisting of both white and black chunks. *Id.* ¶ 7. Ultimately, a sample of the "chunky powder," weighing 25.3 grams, testified positive for the presence of methamphetamine. *Id.* ¶ 3.

¶ 50        On appeal, the defendant asserted "the State failed to prove the mass of the substance containing methamphetamine beyond a reasonable doubt" because it was required to test and weigh the white and black "chunks" separately. *Id.* ¶ 11. This court disagreed, finding "the powder constituted a single substance." *Id.* ¶ 16. In so holding, we relied, in part, on the fact that "the powder was found in a single container," stating as follows:

> "This court has indicated that materials found in separate containers should be considered separate 'substances' even if the contents of the different containers resemble each other. [Citation.] This approach is consistent with the related general requirement that the contents of separate containers be tested separately for the presence of illicit materials. [Citation.] The converse—that the contents of one container, if not further segregated or self-contained, may, within reason, be considered one substance—appears a sound rule of thumb." *Id.* ¶ 17 (citing *People v. Coleman*, 391 Ill. App. 3d 963, 973, 909 N.E.2d 952, 962 (2009) (stating,

hypothetically, that if a defendant combined 15 grams of cocaine and 900 grams of baking soda in a single freezer bag, " 'the two substances would become one substance—*i.e.*, 915 grams of a substance containing cocaine ***' ")).

¶ 51 Here, we find *Jones* and *Adair* are distinguishable from the facts of this case and *Tilley* is most instructive. Specifically, we are not presented with a situation of substances separated into multiple containers or with a single container holding clearly distinct items of varying shapes and color. Instead, the alleged substance containing heroin was all within a single container, a plastic bag, and the evidence reflects nothing distinct about the bag's contents. Little described the bag as containing "brown chunks," with "chunks" that appeared to have been "torn into powdery pieces." Additionally, the record contains a photograph of the suspected heroin as found at the scene, which depicts a clear plastic bag with contents that are uniform in appearance.

¶ 52 Given that the substance containing heroin in this case was all within one container, not further segregated, and with no visible distinguishing features aside from being "chunky," it was permissible for Little to treat the bag's contents as a single substance and perform her chemical analysis from a representative sample of that substance. In this instance, Little determined the bag's contents weighed 21.3 grams. She performed "color chemical tests" on three samples of the substance, which preliminarily indicated the presence of heroin. Additionally, she performed a "[g]as chromatography, mass spectrometry" test on a fourth sample of the substance, which was conclusively positive for the presence of heroin. This evidence was sufficient to establish that 21.3 grams of a substance containing heroin was found inside the Franklin Street residence. Accordingly, defendant's challenge to the sufficiency of the State's evidence is without merit.

¶ 53                                         B. Rule 431(b)

¶ 54 On appeal, defendant next argues the trial court failed to comply with Rule 431(b)

when questioning potential jurors during *voir dire*. Specifically, he argues the court impermissibly (1) combined or "compounded" questions regarding the jurors' understanding and acceptance of each Rule 431(b) principle into a single question and (2) relied on jurors' "lack of response" to its questioning to signify their understanding and acceptance. Further, although defendant acknowledges he did not preserve this issue for appellate review—due to his failure to raise the issue with the court at any point during the underlying proceedings—he argues we may, nevertheless, consider the merits of his claim pursuant to the plain-error doctrine. We disagree and find no clear or obvious error.

¶ 55        "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. A defendant's failure to take either step results in forfeiture of the issue on review. *Id.* However, under the plain-error doctrine, we may excuse a defendant's forfeiture when "a clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* "The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *Id.* ¶ 49.

¶ 56        Rule 431(b) sets forth certain requirements for the trial court when questioning potential jurors in a case during *voir dire*. It states as follows:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is

presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 57 In *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409 (2010), the supreme court held "Rule 431(b) is clear and unambiguous." Further, it outlined the rule's requirements as follows:

"Rule 431(b) *** mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.*

¶ 58 More recently, the supreme court has rejected a very similar argument to the one defendant makes in this case regarding the combining of Rule 431(b) questions. Specifically, in *People v. Birge*, 2021 IL 125644, ¶ 23, the defendant argued that the trial court erred in admonishing the jury venire under Rule 431(b) "by grouping the principles into one broad statement of law," thereby failing "to ensure that the potential jurors understood and accepted each of the four distinct concepts enumerated in the rule." In finding no merit to the defendant's claim,

the court relied on the plain language of the rule, stating as follows:

> "Here, the circuit court read the specific principles set forth in the rule verbatim to the prospective jurors and asked the specific questions required by the rule. Each of the prospective jurors indicated that they understood and accepted those principles by a show of hands. The rule plainly states that the court can ask the questions to the potential jurors as a group, and the rule does not require that their response be conveyed orally rather than by a show of hands. We believe that the procedure followed by the circuit court was all that was required by the plain language of the rule[.]" *Id.* ¶ 27.

¶ 59 The supreme court further explained that neither case authority nor the plain language of the rule required the trial court to "recite the principles *separately* to the prospective jurors." (Emphasis in original.) *Id.* ¶ 34. Ultimately, it held that under Rule 431(b)'s plain language, a court is compliant with the rule "if it (1) instructs the prospective jurors on the four principles, (2) asks if the prospective jurors understand those principles, and (3) asks if the prospective jurors accept those principles." *Id.*

¶ 60 Here, the trial court separately recited the four Rule 431(b) principles to prospective jurors but, following its recitation of each principle, asked a single question regarding whether the jurors' understood and accepted the principle. Further, it directed jurors to raise their hands to indicate any lack of understanding and acceptance and relied on the absence of any raised hands to indicate that jurors, in fact, understood and accepted each principle. Nevertheless, like in *Birge*, we find no clear or obvious error by the court. Specifically, neither supreme court case authority nor the plain language of Rule 431(b) requires a trial court to separate its questioning in any particular manner. In this case, the court's method of inquiry was sufficiently compliant with the

rule because it instructed the venire on the four principles and inquired as to both the jurors' understanding and acceptance of the four principles.

¶ 61 Further, we note Rule 431(b) states only that the trial court's method of inquiry must provide "each juror an *opportunity* to respond to specific questions." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The court's questioning in this case provided each juror with such "an opportunity to respond" and more was not required. Again, as noted in *Birge*, "the rule does not require that [jurors'] response[s] be conveyed orally rather than by a show of hands." *Birge*, 2021 IL 125644, ¶ 27. Additionally, although defendant suggests error occurred because the court did not provide prospective jurors "with any means by which they could ask questions," the plain language of the rule contains no such requirement. Moreover, had any juror not fully understood (or accepted) the principles recited by the court, a raised hand would have alerted the court to the issue and prompted further interaction with the juror.

¶ 62 Under the circumstances presented, the trial court's method of inquiry complied with the dictates of Rule 431(b). Accordingly, there was no clear or obvious error and, thus, no plain error.

¶ 63 C. Jury Instructions

¶ 64 Finally, on appeal, defendant argues the trial court improperly failed to give the jury limiting instructions regarding the permissible admissibility of (1) his prior deliveries of heroin, (2) Holocker's "lay witness opinions of guilt," and (3) "Kamp's admission of guilt to a different offense." Again, defendant acknowledges his forfeiture of these issues by failing to raise them with the trial court but argues his forfeiture may be excused under the plain-error doctrine, in that clear or obvious errors occurred and the evidence at trial was closely balanced. Alternatively, defendant claims his defense counsel was ineffective for failing to request the

appropriate jury instructions.

¶ 65      As stated, under the plain-error doctrine, a defendant's forfeiture may be excused "when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." (Internal quotation marks omitted.) *Sebby*, 2017 IL 119445, ¶ 48. Additionally, under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant alleging ineffective assistance of counsel must show (1) his or her counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Dupree*, 2018 IL 122307, ¶ 44, 124 N.E.3d 908. "A failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *People v. Peterson*, 2017 IL 120331, ¶ 79, 106 N.E.3d 944.

¶ 66                  1. *Evidence of Defendant's Previous Heroin Deliveries*

¶ 67      At trial, the State presented evidence of defendant's involvement in selling and delivering heroin while living at the Franklin Street residence. Defendant argues such evidence was admissible for the limited purpose of showing only that he "may have intended to deliver the suspected heroin in question" and suggests the State improperly argued it established his involvement in a "drug enterprise." Defendant maintains the jury should have been instructed that his prior criminal conduct was relevant for only the limited purpose of showing his intent to deliver the heroin at issue in this case.

¶ 68      "Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime." *People v. Pikes*, 2013 IL 115171, ¶ 11, 998 N.E.2d 1247. More specifically, other-crimes evidence may be admissible "to show

- 23 -

*modus operandi*, a common design or plan, intent, motive, identity, knowledge, or the absence of mistake." *People v. Cloutier*, 156 Ill. 2d 483, 505, 622 N.E.2d 774, 785-86 (1993). "However, even where relevant, the evidence should not be admitted if its probative value is substantially outweighed by its prejudicial effect." *Pikes*, 2013 IL 115171, ¶ 11.

¶ 69    Additionally, "[a] limiting instruction reduces any prejudice created by admitting other-crimes evidence." *People v. Young*, 381 Ill. App. 3d 595, 601, 887 N.E.2d 649, 654 (2008). This court has stated that "[b]ecause of the significant prejudice to a defendant's case that the admission of other crimes evidence usually risks, *** trial courts should not only [give a limiting instruction] at the close of the case, but also orally from the bench (unless defendant objects) at the time the evidence is first presented to the jury." *People v. Denny*, 241 Ill. App. 3d 345, 360-61, 608 N.E.2d 1313, 1324 (1993). However, we have also held that a trial court has "no independent duty to tender such an instruction." *People v. Cregar*, 172 Ill. App. 3d 807, 822, 526 N.E.2d 1376, 1387 (1988); see also *People v. Musitief*, 201 Ill. App. 3d 872, 877, 559 N.E.2d 520, 525 (1990) (holding it is not the trial court's obligation to *sua sponte* give an other-crimes limiting instruction).

¶ 70    Here, defendant does not argue that other-crimes evidence was improperly admitted. Instead, he argues only that reversible error occurred because no limiting instruction was given to the jury. First, we note that evidence of defendant's drug-related activities while residing at the Franklin Street residence was relevant for several purposes, other than his propensity to commit crime, including to show *modus operandi*, a common design or plan, intent, motive, and knowledge. In this case, the evidence was particularly relevant to show a common criminal design between defendant, Turner, and Kamp to sell heroin, supporting his accountability for the charged offense. Given the many purposes for which the drug-related other-crimes evidence was relevant, defendant's assertion on appeal that the jury should have been instructed to consider that evidence

only as it related to his intent is without merit.

¶ 71    Second, as indicated above, this court has held that a trial court has no *sua sponte* obligation to provide an other-crimes limiting instruction to the jury. However, even assuming such an obligation existed, we would find no plain error in the instant case because, contrary to defendant's claims, the evidence at his trial was not closely balanced.

¶ 72    As stated, the drug-related other-crimes evidence was clearly relevant to demonstrate a common criminal design to sell heroin among the individuals living at the Franklin Street residence and the jury could consider such evidence for that legitimate purpose. From the evidence presented, the jury could reasonably infer defendant's agreement to aid Turner and Kamp in selling heroin on an ongoing basis for the purpose of receiving heroin for his own personal use. This is true even if the jury believed defendant's reported statements to Holocker—that the supply of heroin in the residence of which he was aware had dwindled to approximately two to three grams and he was not specifically aware of Turner and Kamp's trip to "re-up" that supply. See 720 ILCS 5/5-2(c) (West 2016) (providing that a person is legally accountable for another's conduct when "before *** the commission of an offense, and with the intent to promote or facilitate that commission, he *** agrees *** to aid that other person in the *** commission of the offense"). Additionally, the State's evidence clearly demonstrated that the weight of the controlled substance in this case was 21.3 grams of a substance containing heroin. Accordingly, we find the lack of any other-crimes limiting instruction did not constitute plain error.

¶ 73    For the same reasons, we find there is not a reasonable probability that, but for defense counsel's failure to request an other-crimes limiting instruction, the result of defendant's trial would have been different. Thus, defendant's ineffective-assistance-of-counsel claim also fails.

¶ 74                              2. *Holocker's Testimony*

¶ 75          Defendant next argues error occurred because the jury was not properly instructed regarding Holocker's testimony. At trial, Holocker stated he was a law enforcement officer and described his experience as it related to drug-related investigations, offenses, and offenders. He testified that in his experience, most heroin users carried only dose amounts of heroin at one time, 21 grams of heroin would not "be a user amount," and drug dealers went to larger "source cities" like Chicago to obtain large amounts of drugs that they broke down into smaller quantities to sell. Upon questioning by the State, Holocker also testified that based on his interview with defendant and the weight of the controlled substance at issue, it was his opinion that defendant, Turner, and Kamp "were all delivering heroin."

¶ 76          Defendant argues that Holocker was a lay witness, noting the State never disclosed him as an expert. Therefore, defendant maintains that the jury should have been instructed "that it need not give any weight at all to [Holocker's] testimony and also that [it was] not to draw any adverse inference from the fact [Holocker was] a law enforcement officer ***." *People v. Thompson*, 2016 IL 118667, ¶ 59, 49 N.E.3d 393 (setting forth procedures for "when the State seeks to introduce lay opinion identification testimony from a law enforcement officer"). Further, defendant contends the jury should also have been instructed to disregard Holocker's opinion that defendant was "delivering heroin."

¶ 77          Illinois Rules of Evidence 701 and 702 (eff. Jan. 1, 2011) set forth parameters for both lay and expert witness testimony. Specifically, lay witness testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge ***." Ill. R. Evid. 701

(eff. Jan. 1, 2011). Conversely, where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 78 The rules of evidence "do not distinguish between expert and lay witnesses but rather between expert and lay testimony." (Internal quotation marks omitted.) *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 82, 130 N.E.3d 432. Thus, a witness can offer both lay and expert testimony in the same case. *Id.* "Law-enforcement officers are especially likely to serve as such dual-capacity witnesses." *Id.* ¶ 83. "An officer testifies as a lay fact witness when the officer testifies, based on personal knowledge, about the events at issue—either the charged offense itself, or law enforcement's investigation of the offense." *Id.* ¶ 88. However, when an officer provides opinions based upon his or her experience—for example, as a narcotics officer—the officer "no longer serves as a fact witness offering lay testimony" and is providing expert testimony, which "must meet the foundational requirements of Rule 702." *Id.* ¶ 89.

¶ 79 However, "[w]hen testimony is improperly admitted as a lay opinion, the error is harmless if the witness was, in fact, qualified as an expert, and thus would have been accepted as an expert by the trial court if so tendered." *Id.* ¶ 110 (citing *People v. Novak*, 163 Ill. 2d 93, 104, 643 N.E.2d 762, 768 (1994), *abrogated on other grounds by People v. Kolton*, 219 Ill. 2d 353, 848 N.E.2d 950 (2006)). Additionally, where " 'an error was harmless, it most certainly cannot rise to the level of plain error.' " *Id.* ¶ 112 (quoting *People v. Leach*, 2012 IL 111534, ¶ 141, 980 N.E.2d 570).

¶ 80 Here, the State does not dispute that it failed to offer Holocker as an expert witness and the record reflects Holocker clearly offered both lay and expert witness testimony.

Specifically, he testified about his involvement in the underlying investigation and the practices and habits of drug dealers and users generally. However, while Holocker was not disclosed as an expert, the record does contain evidence as to his expert witness qualifications. In particular, the State elicited testimony from Holocker regarding his knowledge and experience as it related to narcotics investigations. On appeal, defendant fails to present a fully developed and reasoned argument challenging those qualifications. Under these circumstances, we find any error in the admission of Holocker's expert opinion as lay opinion was harmless. Similarly, we find no "clear or obvious error" in the manner in which the jury was instructed.

¶ 81　　　　Regarding defendant's argument that Holocker was also impermissibly permitted to offer an opinion on whether the occupants of the Franklin Street residence were delivering heroin, we also find no error. The rules of evidence provide that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Ill. R. Evid. 704 (eff. Jan. 1, 2011); see also *People v. Terrell*, 185 Ill. 2d 467, 496, 708 N.E.2d 309, 324 (1998) (stating it is "well settled that a witness, whether expert or lay, may provide an opinion on the ultimate issue in a case"). Here, it was permissible for Holocker to provide an opinion—based upon defendant's statements and the amount of the suspected heroin—on the intent of defendant and his codefendants.

¶ 82　　　　Finally, even if were to find clear or obvious errors as alleged by defendant, for the reasons already expressed, the evidence was not closely balanced. Again, defendant has failed to establish either the occurrence of plain error or that his counsel provided ineffective assistance.

¶ 83　　　　　　　　　　3. *Kamp's Admission of Guilt*

¶ 84　　　　Finally, defendant notes the State presented evidence that Kamp pleaded guilty to one count of delivering between one and five grams of heroin. He argues "[t]he jury should have

been instructed that it was only allowed to consider Kamp's confession and conviction as they related to [Kamp's] credibility."

¶ 85            "A defendant who is separately tried is entitled to have his guilt or innocence determined upon the evidence against him without being prejudged according to what has happened to another." *People v. Sullivan*, 72 Ill. 2d 36, 42, 377 N.E.2d 17, 20 (1978). As a result, evidence that a codefendant or accomplice has pleaded guilty or has been convicted of the same offense is admissible for impeachment purposes but not for purposes of proving the defendant's guilt. *People v. Callaway*, 185 Ill. App. 3d 136, 141, 540 N.E.2d 1153, 1156 (1989) (citing *Sullivan*, 72 Ill. 2d at 42).

¶ 86            Defendant maintains error occurred in this case because the State (1) elicited testimony that Kamp pleaded guilty to a charge that stemmed from the drug-related activities at the Franklin Street residence and (2) argued during its closing argument that Kamp acknowledged being a drug dealer and the same was true of defendant. Here, however, Kamp testified to much more than merely the fact of his conviction. He provided details regarding drug-related activity at the Franklin Street residence and described defendant's involvement in those activities. Such circumstances present a "unique scenario not contemplated within the general prohibition against evidence of a codefendant's conviction." *Callaway*, 185 Ill. App. 3d at 143 (finding no reversible error where the defendant's accomplices testified to a conviction for unlawful delivery and "also gave complete statements concerning the transactions, including details of [the] defendant's participation").

¶ 87            Additionally, we note that "[a]n error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different if the proper instruction had been given." *People v. Johnson*, 146 Ill. 2d 109, 137, 585 N.E.2d 78, 90 (1991). Here, assuming

the jury should have been instructed that the fact of Kamp's conviction only went to the issue of his credibility, any error was harmless in light of the remainder of Kamp's testimony on the issue of defendant's participation in selling heroin out of the Franklin Street residence. As noted, the evidence at trial was not closely balanced and, even if the jury had been instructed as defendant suggests, the result of his trial would not have been different. Defendant has failed to establish either the occurrence of plain error, or that his defense counsel provided ineffective assistance.

¶ 88                                III. CONCLUSION

¶ 89         For the reasons stated, we affirm the trial court's judgment.

¶ 90         Affirmed.